**GERAGOS & GERAGOS**
A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600
GERAGOS@GERAGOS.COM

MARK J. GERAGOS         SBN 108325
BEN J. MEISELAS         SBN 277412
GREG L. KIRAKOSIAN      SBN 294580
TYLER M. ROSS           SBN 292263

**SAMINI SCHEINBERG, PC**
BOBBY SAMINI            SBN 181796
NICOLE PRADO            SBN 269833
MATTHEW M. HOESLY       SBN 289593
949 S Coast Drive, Suite 420
Costa Mesa, CA 92626
Telephone: (949) 724-0900

Attorneys for Plaintiff JAMES FRIEDRICH

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES FRIEDRICH, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | **CASE NO.: 8:14-cv-01969**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **RETALIATION IN VIOLATION OF CAL. GOV. CODE § 12940(h)**<br>2. **RETALIATION IN VIOLATION OF LABOR CODE § 1102.5(c)**<br>3. **CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY**<br>4. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>5. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;**<br>6. **WHISTLEBLOWER VIOLATIONS; 18 U.S.C. §1514A (SECTION 806) OF THE SARBANES-OXLEY ACT**<br><br>**DEMAND FOR JURY TRIAL** |

- 1 -
**COMPLAINT FOR DAMAGES**

## INTRODUCTION

1. Plaintiff James Friedrich began his employment with Defendant Zillow, Inc. ("Zillow") on or about February 15, 2013 as an Inside Sales Consultant. Mr. Friedrich had just completed his undergraduate Business Administration degree from the University of Southern California, enrolled at the University of California, Irvine to pursue a master's degree, and was looking forward to what he thought would be an incredible first job out of college.

2. Mr. Friedrich's enthusiasm was short-lived. After starting at Zillow, Mr. Friedrich quickly uncovered a covert advertising scheme involving fake real estate agent accounts, fraudulent advertising sales procured by forging real estate agents' signatures, and numerous violations of the Real Estate Settlement Procedures Act ("RESPA"). Mr. Friedrich reported the scheme to his manager, who chose to turn a blind eye and reap the benefits of the fraudulently inflated business being reported back to Zillow's headquarters.

3. Mr. Friedrich continually insisted that Zillow take action to thwart the fraudulent conduct occurring within its own offices. Instead, Mr. Friedrich's manager told him to "drop it" and to "stop hanging out" with two other Zillow employees who also knew of the scheme—Mr. Friedrich's two best friends at Zillow. Mr. Friedrich subsequently informed his two friends that he had been instructed to avoid them.

4. In response, Mr. Friedrich's manager exploded with rage and reprimanded Mr. Friedrich, screaming that he "can't believe [Mr. Friedrich] would fucking tell them" that he had been instructed to keep silent around his friends and that his conduct was "fucking bullshit."

5. Mr. Friedrich was disheartened and extremely upset by this inexplicable outburst, and made the difficult decision to notify Zillow's corporate office of the shockingly deceptive conduct and culture of silence occurring within its Irvine, California office. In response, Mr. Friedrich's managers in Irvine undertook a retaliatory campaign designed to intimidate and harass him. Mr. Friedrich brings this

- 2 -
**COMPLAINT FOR DAMAGES**

1  action based on the retaliation he endured while trying to stop the fraudulent and
2  abusive conduct occurring within Zillow's offices.

## PARTIES

4  6. Plaintiff James Friedrich, at all relevant times, was an individual residing
5  in Orange County, California.

6  7. Defendant Zillow, Inc. (NASDAQ: Z), at all relevant times, was a
7  Washington corporation with its headquarters and principal place of business in
8  Seattle, Washington. Zillow is registered to do business in the State of California and
9  maintains an office with over a hundred employees in Orange County, California.
10 Zillow is an online home and real estate marketplace for homebuyers, sellers, renters,
11 real estate agents, mortgage professionals, landlords, and property managers. Zillow
12 claims its database contains more than 110 million U.S. homes. Zillow also operates
13 the largest real estate and rental advertising networks in the country.

14 8. Plaintiff is unaware of the true names and capacities of the Defendants
15 named herein as Does 1 through 50, inclusive, and therefore sues said Defendants by
16 such fictitious names. Plaintiff will seek leave of court to amend this Complaint to
17 allege the true names and capacities of said Defendants when the same are
18 ascertained. Plaintiff is informed and believes and thereon alleges that each of the
19 aforesaid fictitiously named Defendants is responsible in some manner for the
20 happenings and occurrences hereinafter alleged, and that Plaintiff's damages and
21 injuries as herein alleged were caused by the conduct of said Defendants.

## JURISDICTION AND VENUE

23 9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332
24 because the amount in controversy as to Plaintiff exceeds $75,000.00 exclusive of
25 interest and costs and because Defendant is incorporated in a state other than the state
26 in which Plaintiff resides and Defendant has its principal place of business and high-
27 level officers which direct, control, and coordinate the corporation's activities from its
28 headquarters in Seattle Washington.

10. This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in the Central District of California.

## GENERAL ALLEGATIONS

12. Mr. Friedrich began his employment with Zillow on or about February 15, 2013. He had recently obtained a degree in Business Administration from the Marshall School of Business at the University of Southern California. Mr. Friedrich was a model student athlete. He graduated in only three years while excelling at water polo on both the university's team and the United States Senior National B Team.

13. After his undergraduate collegiate studies, Mr. Friedrich enrolled at the University of California, Irvine to pursue a master's degree. After enrolling for classes, Mr. Friedrich was offered a position as an Inside Sales Consultant at Zillow.

14. In recognition of the ambitious work and school schedule he would be balancing, Mr. Friedrich asked his managers at Zillow if his studies would conflict with his employment. Zillow's managers told him, and assured him, his master's degree would not conflict with his employment.

15. Mr. Friedrich accepted the employment offer with Zillow based in part on these assurances by Zillow's management and by the incredible opportunity he believed he was offered. The demanding work hours and environment at Zillow forced Mr. Friedrich to put his master's degree on hold in spring 2013, shortly after he started his employment.

16. Mr. Friedrich then devoted his attention wholeheartedly to his employment at Zillow. He was an outstanding Inside Sales Consultant and model employee at Zillow's Irvine, California office. Over the course of his employment, Mr. Friedrich successfully performed his duties and consistently met his target sales goals and other criteria established by Zillow. He won numerous sales contests within

his first six months and earned the "Grinder" award, recognizing him as the "Hardest Worker in Orange County." He was the first Zillow employee in Orange County to log 500 minutes (eight hours and twenty minutes) of call time—time actually conversing with potential Zillow clients, not including time spent dialing or leaving messages—during a single work day.

17. Despite universal recognition as one of Zillow's top performers and numerous accolades for his sales performance, Mr. Friedrich was targeted, harassed, intimidated, and ultimately unlawfully terminated upon his discovery and objection to Zillow's systematic and pervasive violations of RESPA and the fraudulent activities condoned by Zillow's management to disguise and hide such blatant violations.

## Zillow's Illegal and Fraudulent Conduct

18. On or about June 2013, Zillow began an advertising initiative entitled the "Co-Marketing Program." This program encouraged mortgage lenders to partially fund real estate agents' advertisements on Zillow's website in exchange for being listed as a "Preferred Lender" alongside those agents' ads.

19. This "pay for play" arrangement allows a mortgage lender to pay Zillow for a portion of a real estate agents' advertising in exchange for that real estate agent "steering" home-buyers to that mortgage lender.

20. Zillow's Co-Marketing Program also allows mortgage lenders to threaten to stop funding ads purchased by outside real estate agents through Zillow if the agents fail to refer enough home-buyers to the lender.

21. While RESPA allows mortgage lenders and real estate agents to co-market in certain situations, the Act's "anti-kickback" provision strictly prohibits mortgage lenders from paying more than their pro-rata share of any joint advertising with real estate agents. For example, a mortgage lender may not pay for more than 50% of the co-marketing costs shared between one lender and one agent, nor may a mortgage lender pay for more than 33% of the co-marketing costs shared between one lender and two agents, etc.

### Mr. Friedrich Discovers Zillow's Fraudulent Advertising Sales and Potential RESPA Violations

22. Mr. Friedrich discovered the first of these fraudulent activities on or around October 23, 2013. Mr. Friedrich learned that numerous individual real estate agents' advertising accounts were more than 50% funded by the same mortgage lender's credit card—an arrangement that Mr. Friedrich knew to be a blatant violation of RESPA. Mr. Friedrich knew this was a RESPA violation because Zillow's own internal guidelines specifically stated that mortgage lenders were not allowed to pay more than 50% of the co-marketing expenses.

23. Mr. Friedrich disclosed the illegal activity and RESPA violations to his co-worker Ashley Boehler. Mr. Boehler agreed that this illegal arrangement violated RESPA and pointed out that there were also numerous instances of contract fraud in connection to these same accounts.

24. As Mr. Boehler explained, when advertising payments were due by a real estate agent, the agent's email address would surreptitiously be changed immediately before the advertising contract was emailed to the agent. The contract was then sent to a new, "dummy" address, signed by an unknown person, and sent back to Zillow from that same "dummy" address. Immediately thereafter, the agent's "dummy" email address in Zillow's system was switched back to the original, authentic address.

25. Mr. Friedrich soon discovered the explanation for this irregular conduct: a Zillow employee was sending these advertising contracts to his own email address and forging the real estate agent's signature in order to drive up his advertising sales numbers. These real estate agents were then fraudulently charged for advertising they never agreed to purchase.

### Mr. Friedrich Discovers Zillow Turned a Blind Eye to Mortgage Lenders Posing as Real Estate Agents on its Own Platform

26. By cross-referencing Zillow's advertising accounts with the California Bureau of Real Estate's list of licensed real estate agents, Mr. Friedrich discovered

1  that numerous advertising accounts — supposedly held by California realtors—were not held by individuals licensed to sell real estate. In fact, these were "dummy" accounts set up and funded by mortgage lenders in order to defraud the public and obtain leads on home loans.

27. Mr. Friedrich recognized that the public would not be able to discern whether they were in fact speaking with a licensed California real estate agent or a mortgage lender posing as one.

28. Because of the seriousness of these misrepresentations and fraudulent activities, as well as the potential liability Zillow could face if the illegal activity continued unchecked, Mr. Friedrich called a meeting with his manager on or around October 28, 2013. Mr. Friedrich detailed the numerous RESPA violations, fraudulent contracts, and "dummy" real estate agent accounts to his manager, as well as outlined the necessary steps to resolve each issue.

29. Mr. Friedrich's manager assured him that he would immediately address these issues with upper management, and promptly ended the meeting.

30. In the following days, Mr. Friedrich noticed that the illegal violations continued and that no steps had been taken to remedy these issues. For several weeks, Mr. Friedrich approached his manager informing him that the illegal activities still had not been addressed.

31. After repeatedly brushing off Mr. Friedrich and assuring him that these issues would be addressed, his manager eventually became angry with Mr. Friedrich and demanded that he "drop it."

32. Mr. Friedrich pressed further, and in response his manager again insisted that he "drop it," demanded that he not mention it to other employees, and to immediately "stop hanging out" with Mr. Boehler and other employees aware of Zillow's fraudulent and illegal conduct.

**COMPLAINT FOR DAMAGES**

**Mr. Friedrich Reports the Fraudulent Conduct and Zillow's Managers Retaliate Against Him**

33. Shocked at his manager's demands, Mr. Friedrich informed his two friends that he had been instructed to no longer speak with them. When Mr. Friedrich's manager learned that Mr. Friedrich had discussed this issue, he screamed at Mr. Friedrich explaining that he "can't believe [Mr. Friedrich] would fucking tell them" that he had been instructed to keep silent. Mr. Friedrich was extremely upset by this outburst, and was nearly brought to tears by his manager's attempt to bludgeon him into silence.

34. Because Zillow's management team had attempted to censor Mr. Friedrich and failed to address the widespread fraud and deception as described herein, Mr. Friedrich and Mr. Boehler informed Zillow's executive team in Seattle about the pervasive fraud and illegality occurring at the Irvine office.

35. On or about November 4, 2013, Mr. Friedrich and Mr. Boehler sent an anonymous "whistle-blower" email to Zillow's headquarters describing the fraud and RESPA violations occurring in Zillow's Irvine office, as well as detailed documentary evidence supporting their concerns. A portion of that email follows:

> This matter needs immediate attention. Our entire company, our Premier Agent product, and the lender co-marketing program could be at risk. Local management has been informed of these accounts over one month ago and refuses to take action. Numerous employees have complained…no action has been taken…it seems as if management has actively chosen to look the other way, or simply refuse to investigate for themselves. We have major RESPA violations happening. We have agents not licensed to service our customers as Premier Agents. We have what appear to be forged contracts being signed.

36. Shortly after his identity was disclosed to Zillow's executive team, Mr. Friedrich suffered numerous retaliatory actions at the hands of the Irvine management

1  team. He was immediately micromanaged at an unprecedented level by his superiors, who greatly reduced his freedom to operate at Zillow. For example, management drastically reduced the number of "inbound leads" allocated to Mr. Friedrich. "Inbound leads" are sales calls coming from clients who are interested in purchasing advertising and are the most effective way to reach the demanding sales quotas set by Zillow's management. Notably, Zillow's managers have complete and unbridled discretion to allocate "inbound leads" as they please.

37.  The retaliatory reduction in Mr. Friedrich's "inbound leads," especially in light of his stellar work performance, severely impaired his ability to generate sales numbers comparable to his peers who received the usual amount of inbound leads.

38.  Nonetheless, Mr. Friedrich kept his sales numbers up only to witness numerous co-workers who generated lower sales numbers enjoy promotions that were never offered to him. Zillow's Director of Sales in Orange County even denied, without legitimate explanation, Mr. Friedrich the ability to take paid time off in April 2014. Mr. Friedrich previously enjoyed a friendly relationship with the Director of Sales prior to exposing the office's fraudulent activities to Zillow's executive team. After Mr. Friedrich reported the wrongful conduct described herein, the Director of Sales refused to speak to him.

39.  As a result of this pervasive and systematic pattern of harassment and retaliation, Mr. Friedrich suffered numerous emotional breakdowns.

40.  Finally, as a direct result of Zillow's blatant retaliation for bringing fraudulent and illegal activity to its attention, Mr. Friedrich was forced to resign in May 2014.

## FIRST CAUSE OF ACTION

## RETALIATION IN VIOLATION OF CAL. GOV. CODE § 12940(h)

41.  Plaintiff realleges and incorporates as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

42. Plaintiff claims that Defendant retaliated against him for raising concerns over several pervasive fraudulent activities that Defendant and several of its employees were engaged in.

43. Defendant failed to address Plaintiff's concerns on numerous occasions.

44. Defendant failed to address Plaintiff's concerns until Plaintiff sent out an anonymous email to members of Defendant's upper management located in Defendant's corporate offices headquartered in Seattle, Washington.

45. The acts and/or omissions of Defendant materially and adversely affected the terms and conditions of Plaintiff's employment as Plaintiff was subjected to ridicule, abuse, arbitrary and capricious reprimands, and various other austerity measures taken against Plaintiff to punish him for "blowing the whistle" on the pervasive fraudulent activities that Defendant was engaged in.

46. Plaintiff's discovery and revelation of the pervasive fraudulent activities was the sole motivating factor for Defendant's retaliatory conduct against Plaintiff.

47. Defendant Zillow ratified its agents, servants, employees, and authorized representatives' unlawful conduct and behavior as described herein by: (1) allowing the pervasive fraudulent activity to occur without rectifying it despite repeated attempts by Plaintiff to call it to Defendant's attention; (2) condoning the pervasive fraudulent activities by failing to act upon Plaintiff's requests; and (3) condoning the retaliatory measures taken against Plaintiff by failing to intervene and halt the behavior and actions of Defendant's management team in the Irvine office.

48. The acts and/or omissions of Defendant caused Plaintiff to suffer harm and economic damages for loss of past projected commissions and earnings, loss of earning capacity, loss of such employment related opportunities as the opportunity for advancement and promotion within Defendant, in amounts according to proof at trial.

49. In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-

1 being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## SECOND CAUSE OF ACTION

## RETALIATION IN VIOLATION OF LABOR CODE § 1102.5(c)

50. Plaintiff realleges and incorporates as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

51. Plaintiff engaged in a protected activity when Plaintiff refused to engage in the pervasive and fraudulent activities that Defendant and its employees were engaged in.

52. Plaintiff had reasonable cause to believe that Defendant's constant fraudulent activities would result in noncompliance with the Real Estate Settlement Procedures Act pursuant to 12 U.S.C. § 2607.

53. As a result of Plaintiff's refusal to engage in Defendant's pervasive and fraudulent activity, Plaintiff suffered unfavorable personnel action(s) by being subjected to unprecedented scrutiny and alienation, harassment, reduced leads, and other measures that directly and negatively affected Plaintiff's earnings.

54. The protected activity was the contributing factor in the unfavorable personnel action as set forth above, which invariably affected the outcome of Defendant's decision to exercise such an unfavorable personnel action(s) against Plaintiff.

55. Defendant cannot and will not be able to prove by clear and convincing evidence that such unfavorable employment actions as set forth above would have been taken in the absence of Plaintiff's protected behavior and/or conduct in refusing to engage in Defendant's pervasive fraudulent activities.

56. As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized

representatives as aforesaid, Plaintiff has suffered past and future special damages, including impairment of reputation and personal humiliation, past and future general damages in an amount according to proof at trial. Plaintiff has been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

57. In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## THIRD CAUSE OF ACTION

## CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY

58. Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporate the same herein by this reference as though set forth in full.

59. Constructive discharge occurs when the employers conduct is so egregious that it effectively causes the employee to resign. The employer must either intentionally create or knowingly permit working conditions that are so intolerable at the time of the employee's resignation, that a reasonable person in the employee's position would be compelled to resign.

60. It is the express fundamental public policy of the State of California that employers may not retaliate against employees because of their reporting of said misconduct.

61. As noted above, Defendant retaliated against Plaintiff. Defendant's conduct continued until Plaintiff was forced to terminate his employment because of the hostile work environment.

62. Plaintiff was subjected to such severe, widespread, and persistent harassment and retaliatory conduct that a reasonable employee would have considered his work environment to be abusive. Accordingly, Plaintiff's resignation with Defendant effectively constituted constructive termination of his employment.

63. Defendant's constructive termination of Plaintiff's employment—as a direct result of Plaintiff's reporting of Defendant's misconduct—constitutes a wrongful employment termination in violation of California's fundamental public policy.

64. As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiff has suffered past and future special damages, including impairment of reputation and personal humiliation, past and future general damages in an amount according to proof at trial. Plaintiff has been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

65. In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## FOURTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

66. Plaintiff realleges and incorporates as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

67. Defendant's conduct, as described above, was extreme and outrageous and beyond the bounds of decency tolerated in a civilized society.

68. Defendant's conduct was intended to cause Plaintiff emotional distress and Defendant acted with a reckless disregard to the probability that Plaintiff would suffer emotional distress.

69. Defendant Zillow ratified its agents, servants, employees, and authorized representatives' unlawful conduct and behavior as described herein by: (1) allowing the pervasive fraudulent activity to occur without rectifying it despite repeated attempts by Plaintiff to call it to Defendant's attention; (2) condoning the pervasive fraudulent activities by failing to act upon Plaintiff's requests; and (3) condoning the retaliatory measures taken against Plaintiff by failing to intervene and halt the behavior and actions of Defendant's management team in the Irvine office.

70. Plaintiff suffered severe emotional distress.

71. Defendant was a substantial factor in causing Plaintiff's severe emotional distress.

72. As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiff has suffered past and future special damages and past and future general damages in an amount according to proof at trial. Plaintiff has been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

73. In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

**COMPLAINT FOR DAMAGES**

## FIFTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

74. Plaintiff realleges and incorporates as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

75. Defendant owed a duty to use reasonable care in its conduct with regard to the health, safety, and rights of Plaintiff. It was foreseeable and probable that Plaintiff would suffer severe emotional distress from Defendant's conduct.

76. Defendant was negligent by breaching the duty of care it owed to Plaintiff when Defendant's agents, employees, and representatives repeatedly harassed, reprimanded, discouraged, and intimidated Plaintiff, and Defendant was aware of such conduct by its agents, employees, and representatives and allowed it to continue.

77. Defendant Zillow ratified its agents, servants, employees, and authorized representatives' unlawful conduct and behavior as described herein by: (1) allowing the pervasive fraudulent activity to occur without rectifying it despite repeated attempts by Plaintiff to call it to Defendant's attention; (2) condoning the pervasive fraudulent activities by failing to act upon Plaintiff's requests; and (3) condoning the retaliatory measures taken against Plaintiff by failing to intervene and halt the behavior and actions of Defendant's management team in the Irvine office.

78. Plaintiff suffered severe emotional distress.

79. Defendant was a substantial factor in causing Plaintiff's severe emotional distress.

80. As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiff has suffered past and future special damages and past and future general damages in an amount according to proof at trial. Plaintiff has been damaged emotionally and financially, including but not limited to emotional

1  suffering from emotional distress and ridicule, as well as loss of income and earnings
2  potential.

3      81. In engaging in the conduct as hereinabove alleged, Defendant and its
4  agents, servants, employees, and authorized representatives acted with malice, fraud,
5  and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-
6  being, and intended to subject Plaintiff to unjust hardship, thereby warranting an
7  assessment of punitive damages in an amount sufficient to punish Defendants and
8  deter others from engaging in similar conduct.

## SIXTH CAUSE OF ACTION

## VIOLATION OF 18 U.S.C. § 1514A (SECTION 806)

## OF THE SARBANES-OXLEY ACT

12      82. Plaintiff realleges and incorporates as if fully stated herein each and
13  every allegation contained above and incorporates the same herein by this reference as
14  though set forth in full.

15      83. Plaintiff engaged in a protected activity with regard to Plaintiff's
16  disclosure to Defendant's upper management of the pervasive and fraudulent activities
17  that Defendant and its employees were engaged in.

18      84. Defendant knew that Plaintiff was engaged in the protected activity of
19  reporting and providing information and documentation concerning the pervasive
20  fraudulent activities that ran rampant throughout Defendant's office in Irvine,
21  California.

22      85.  Plaintiff suffered an unfavorable personnel action(s) by being subjected
23  to unprecedented scrutiny and overbearing micromanagement of daily tasks, austerity
24  measures in the form of losing sales calls, denial of promotions, and other measures
25  that directly and negatively affected Plaintiff's earnings.

26      86. The protected activity was the contributing factor in the unfavorable
27  personnel action as set forth above, which invariably affected the outcome of

**COMPLAINT FOR DAMAGES**

1 Defendant's decision to exercise such an unfavorable personnel action(s) against
2 Plaintiff.

3     87. Causation is established and inferred from the timing of the adverse
4 employment action(s) following on the heels of the protected activity.

5     88. Defendant cannot and will not be able to prove by clear and convincing
6 evidence that such unfavorable personnel action(s) as set forth above would have been
7 taken in the absence of Plaintiff's protected behavior and/or conduct in reporting the
8 pervasive fraudulent activities to Defendant's corporate offices in Seattle,
9 Washington.

10     89. As a direct and proximate cause of the tortious, unlawful, and wrongful
11 acts of Defendant and its respective agents, servants, employees, and authorized
12 representatives as aforesaid, Plaintiff has suffered past and future special damages,
13 including impairment of reputation and personal humiliation, past and future general
14 damages in an amount according to proof at trial. Plaintiff has been damaged
15 emotionally and financially, including but not limited to emotional suffering from
16 emotional distress and ridicule, as well as loss of income and earnings potential.

17     90. In engaging in the conduct as hereinabove alleged, Defendant and its
18 agents, servants, employees, and authorized representatives acted with malice, fraud,
19 and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-
20 being, and intended to subject Plaintiff to unjust hardship, thereby warranting an
21 assessment of punitive damages in an amount sufficient to punish Defendants and
22 deter others from engaging in similar conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff James Friedrich respectfully requests for judgment to be entered upon Defendant Zillow, Inc. as follows:

1. For general and special damages for an amount to be determined at trial;
2. For pre- and post-judgment interest according to proof;
3. For Punitive Damages where applicable;

1. 4. For Attorney Fees where applicable;
2. 3. For costs of suit incurred herein; and
3. 4. For all other relief as this court may deem proper.

DATED: December 11, 2014

GERAGOS & GERAGOS, APC
SAMINI SCHEINBERG, PC


By: /s/ MARK J. GERAGOS
MARK J. GERAGOS
BEN J. MEISELAS
GREG L. KIRAKOSIAN
TYLER M. ROSS
BOBBY SAMINI
NICOLE PRADO
MATTHEW M. HOESLY
Attorneys for Plaintiff
JAMES FRIEDRICH

## DEMAND FOR JURY TRIAL

Plaintiff James Friedrich hereby demands a jury trial.

DATED: December 11, 2014

GERAGOS & GERAGOS, APC
SAMINI SCHEINBERG, PC


By: /s/ MARK J. GERAGOS
MARK J. GERAGOS
BEN J. MEISELAS
GREG L. KIRAKOSIAN
TYLER M. ROSS
BOBBY SAMINI
NICOLE PRADO
MATTHEW M. HOESLY
Attorneys for Plaintiff
JAMES FRIEDRICH

**COMPLAINT FOR DAMAGES**